522 So.2d 1100 (1988)
STATE of Louisiana
v.
Michael Ray CARTER.
No. KA 87 0766.
Court of Appeal of Louisiana, First Circuit.
February 23, 1988.
*1102 Bryan Bush, Dist. Atty., Baton Rouge by Louis Daniel, Asst. Dist. Atty., for plaintiff/appellee.
Office of the Public Defender, Baton Rouge, for defendant/appellant.
Before COVINGTON, C.J., and SAVOIE and LeBLANC, JJ.
COVINGTON, Chief Judge.
Michael Ray Carter was charged by bill of information with armed robbery, a violation of LSA-R.S. 14:64. He was tried by a jury which convicted him as charged; and he was subsequently sentenced to imprisonment for a term of sixty years at hard labor without benefit of parole, probation or suspension of sentence. He has appealed, urging seven assignments of error, to wit:
1. The trial court erred by denying defendant's motion to quash the jury panel and his motion for a mistrial.
2. The trial court erred by denying defense counsel's objection to an irrelevant question.
3. The trial court erred by overruling defense counsel's objection to statements made by the prosecutor during the state's closing rebuttal argument.
4. The trial court erred by overruling defense counsel's objection to statements made by the prosecutor during the state's closing rebuttal argument.
5. The trial court erred by denying defendant's request for a limiting jury instruction.
6. The trial court erred by imposing an excessive sentence and failing to follow the sentencing guidelines provided in LSA-C.Cr.P. art. 894.1.
7. The verdict is contrary to the law and/or the evidence.
Assignment of error number two was not briefed on appeal and, therefore, is considered abandoned. Uniform Rules Courts of Appeal, Rule 2-12.4.
The instant offense pertains to the armed robbery of First Federal Savings and Loan Association (hereinafter referred to as First Federal) in East Baton Rouge Parish. The crime was committed on August 15, 1986.
At about 10:00 a.m. on the day in question, Tyressa Decuir (a teller) was working at her teller station; and Leander Percy Winfield, III, a First Federal assistant vice-president and Loan Administration Manager, was getting a money order at another teller's station, approximately two stations away from Decuir. A man walked up to the counter at Decuir's teller station. Decuir asked the man if she could help him. He responded, in a stuttering voice, that he wanted to withdraw some money from his savings account. Decuir told him he would have to fill out a withdrawal slip. After completing a transaction for another First Federal employee, Decuir observed that the man was still standing at the counter. She repeated to him that he needed to complete a withdrawal slip in order to make a withdrawal. The man then slid a note across the counter to Decuir. Decuir testified that the note was written on what appeared to be a blue check. While she read the note, the man pulled out a white pillowcase from inside his pants. He also pulled out a small silver pistol which he pointed at her. Decuir then realized that a "hold-up" was in progress.
In the meantime, Winfield noticed that Decuir was "shaking a pillowcase out." Winfield looked at the robber who told him: "Yes, it's a robbery and don't you move." For about onetwo minutes, Winfield merely continued to stand where he was and look at the robbery.
Decuir testified that she complied with the instructions in the robber's note, which specifically forbade her to activate any *1103 alarm and stated that otherwise "you're dead." She removed all the money from her drawer, approximately three thousand dollars, put it inside the pillowcase and handed it to the robber. The robber then took the pillowcase and walked out the front door of First Federal, leaving the note he had used on the counter.
Decuir and Winfield testified that the robber wore a pair of sunglasses and a "sailor's cap" which was "turned down" and that the robber had a mustache. The testimony of Decuir and Winfield revealed that both had recently attended a security training class approximately two days before the robbery. Winfield testified that while he was looking at the robber he thought that he would later be asked to make an identification and that he paid attention to the robber. Similarly, Decuir testified that, because she had attended the security class, she realized that she might be later asked to identify the robber. Decuir also testified that she got a "good look" at the robber, that she was face-to-face with the robber and that the lighting inside First Federal was "normal."
After the robber left First Federal, the police were summoned to the scene. Investigating officers discerned that the note used by the robber, had been written on a printed check form of Freddie Samuel Williams who was then incarcerated in the downtown jail. The police talked to Williams that same day; and, later that evening at about 9:00 p.m., defendant was arrested at the Universal Motel when he apparently returned to his room there. Sgt. Greg Phares of the Baton Rouge City Police Department testified that, after defendant's arrest, defendant signed a form consenting to a search of his motel room. Phares noted that, in talking to the police, defendant stuttered. The actual search was conducted between approximately midnight and 1:00 a.m. the morning after defendant's arrest. According to Phares, the search revealed only that the pillowcase was missing from the bed in defendant's motel room.
On the evening following defendant's arrest, Phares conducted separate photographic lineups with Decuir and Winfield. The lineups consisted of six photographs, one of which was defendant's. Decuir and Winfield each selected defendant's photograph as positively depicting the robber. On August 20, both Decuir and Winfield identified defendant as the robber at a six man physical lineup held at the parish prison. Decuir stated that she was positive in making her selection at the physical lineup. Furthermore, at trial, both Decuir and Winfield made positive in-court identifications of defendant as the robber.
Additionally, the testimony of Winfield and Norbert Rayford (the chairman of the board of directors and president of First Federal) revealed that four cameras were operating in First Federal on the day of the robbery and that the robbery was recorded on video tape. The state introduced into evidence the video tape, and the jury was allowed to view the pertinent portion of the tape. Also introduced into evidence were a series of photographs of the person depicted on the tape. The photographs were taken by George Robert Skaluba, an audio-visual specialist, employed at the Laboratory Division of the FBI in Washington, D.C. Some of the photographs introduced into evidence had been enhanced by Skaluba.
ASSIGNMENT OF ERROR NO. ONE:
By means of this assignment, defendant contends that the trial court erred by denying his motion to quash the jury panel and his motion for a mistrial. He argues that, because he is a member of the black race, the trial court should have granted either one or the other of his motions on the basis of the prosecutor's use of peremptory challenges to exclude black prospective jurors.
A peremptory challenge by the state shall not be based solely upon the race of the juror. LSA-C.Cr.P. art. 795(B). In Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the United States Supreme Court held that the Equal Protection Clause forbids the state from using its peremptory challenges to strike potential jurors of the defendant's race solely on account of their race or the assumption that jurors of the defendant's *1104 race will be unable to impartially consider the state's case against the defendant.
In Batson, supra, the United States Supreme Court held that a defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial. In regard to the establishment of such a prima facie case, the Supreme Court stated the following:
To establish such a case, the defendant first must show that he is a member of a cognizable racial group, Castaneda v. Partida, supra, 430 U.S. [482], at 494, 97 S.Ct. [1272], at 1280 [51 L.Ed.2d 498 (1977) ], and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits `those to discriminate who are of a mind to discriminate.' Avery v. Georgia, supra, 345 U.S. [559], at 562, 73 S.Ct. [891], at 892 [97 L.Ed. 1244 (1953) ]. Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race. This combination of factors in the empanelling of the petit jury, as in the selection of the venire, raises the necessary inference of purposeful discrimination.
In deciding whether the defendant has made the requisite showing, the trial court should consider all relevant circumstances. For example, a `pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination. Similarly, the prosecutor's questions and statements during voir dire examination and in exercising his challenges may support or refute an inference of discriminatory purpose. These examples are merely illustrative. We have confidence that trial judges, experienced in supervising voir dire, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors.
Once the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging black jurors. * * * The trial court then will have the duty to determine if the defendant has established purposeful discrimination.21
* * * * * *
21 In a recent Title VII sex discrimination case, we stated that `a finding of intentional discrimination is a finding of fact' entitled to appropriate deference by a reviewing court. Anderson v. Bessemer City, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). Since the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference. Id., at 575, 105 S.Ct., at 1512.
106 S.Ct. at 1723-1724.
The record reflects that the trial court employed a procedure during voir dire whereby the prosecutor and defense counsel each separately but simultaneously submitted in writing (on a form provided by the court) the names of any prospective juror(s) they wanted to peremptorily challenge. In this case, the prosecutor used only nine of the twelve peremptory challenges available to the state, and eight of those used were to exclude black prospective jurors, viz, Ms. Margery Williams, Ms. Sandra Daniels, Ms. Mary E. Lee, Ms. Marian Tennart, Ms. Carla Kennison, Mr. Eugene Hulbert, Ms. Bridget Burton, Ms. Vennolia Perkins. At the conclusion of voir dire and after the entire twelve person jury was sworn and seated, defense counsel objected to the state's use of its peremptory challenges, alleging that the challenges had been exercised on the basis of race. He asked in the alternative that the court grant a motion to quash the jury panel and a motion for mistrial. In overruling defense counsel's objection and denying the requested relief, the trial court stated that three of the twelve persons comprising the jury were of the black race, that the prosecutor had given the court written reasons for the peremptory challenges he used and that there had been no *1105 systematic exclusion of blacks from the jury in this case.
The written reasons, which the prosecutor gave to the trial court, for peremptorily challenging the black prospective jurors in this case, were as follows: (1) Ms. Williams was employed with the Office of Family Security and she seemed to be very strong willed and might not be open-minded during jury deliberations. (2) Ms. Daniels was employed as a teacher in the Head Start Program. (3) Ms. Tennart had recently been convicted of theft. (4) Ms. Kennison was peremptorily challenged because her area of study in college was social work. (5) Mr. Hulbert stated, during questioning by the prosecutor, that he could not follow the law as to the state's burden of proof. (6) Ms. Burton did not seem to understand "what was going on." (7) Ms. Perkins had previously served on a jury.
After careful review of the entire voir dire proceedings, we conclude that the black prospective jurors peremptorily challenged by the state were challenged on the basis of clearly justifiable reasons and stemmed from factors unrelated to race. We note that the record does not indicate that the prosecutor's acceptance of any of the persons who actually served on the jury was inconsistent or contrary to any of the reasons and stated bases he gave for peremptorily challenging black prospective jurors in this case. Additionally, the record shows that three members of the twelve person jury were black and that the state had unused peremptory challenges available to exclude those blacks had discrimination been its intention. See State v. Brown, 507 So.2d 304 (La.App. 3rd Cir. 1987). Hence, defendant failed to establish that there was purposeful discrimination in this case. We find that there was no Batson discrimination in the selection of the jury.
This assignment lacks merit.
ASSIGNMENTS OF ERROR NOS. THREEFIVE:
By means of these assignments, defendant contends that the trial court erred by overruling defense counsel's objections to statements made by the prosecutor during the state's closing argument in rebuttal and by denying defense counsel's requested jury admonition. Defendant argues that the prosecutor's statements exceeded the scope of permissible argument as set forth in LSA-C.Cr.P. art. 774. Defendant's argument appears to rest upon a single premise, i.e., his assertion that the prosecutor's statements tended to mislead the jury into thinking that defendant did not meet his burden of proof when in fact the burden of proof was that of the state. He concludes that the prosecutorial statements prejudiced his case.
During the prosecutor's closing argument in rebuttal to the jury, the following colloquy occurred:
Mr. Price mentioned that there's a note here, a note, which we don't have any handwriting analysis. That could have sewn the case up! Not necessarily. State is not required to prove that Michael Carter is the one that wrote the note, anyone could have written that note. The fact is, the State proved Michael Carter used that note. He's the one that pushed it across to Tyressa Decuir. I don't know whether Michael Carter wrote that note or not. And, no, the F.B.I. did not analyze it for handwriting. And what do you get when you do analyze something for handwriting? You get someone who compares, looks, and says this is similar, this is not similar. In my opinion, the same person wrote it because it's similar. Or, in my opinion, the same person didn't write it because it's not similar. But if that is so all-powered important, the Defense had access to that note, too. That's
MR. PRICE: Judge, I'm going to have to object to that. That's not true. And I think he is getting into making the argument that I should have proven something there, when I had no burden of proof here.
MR. DANIEL: Judge, he's the one that brought up what was done and what was not done with the evidence, and I think it's fair for the State to argue what could have been done with the evidence, just like he argued it.

*1106 THE COURT: Objection is overruled.
MR. PRICE: Judge, I'd like the jury instructed that I did not have access to that item, as well. And I'd like a jury instruction that I had no obligation to prove anything.
THE COURT: Objection is overruled.
MR. PRICE: I'll assign error to the court's ruling.
THE COURT: Objection is noted.
Thereupon, the prosecutor continued his closing argument and noted that the "[d]efense could have had that note analyzed, with exemplars," prompting defense counsel to repeat his previous objection. Again, the trial court overruled the objection; and, in so doing, the trial court noted that defense counsel had opened the door, during his closing argument, to the argument made by the prosecutor on rebuttal and that an admonition was not necessary unless the prosecutor exceeded what the court felt appropriate to rebut the argument defense counsel had made.
Thereafter, the prosecutor continued his closing argument, in pertinent part, as follows:
I was tellingarguing to you that the laws in the state of Louisiana provide discovery in a case, where things aren't surprise, especially the physical items of evidence, discovery and inspection. That applies to that note, too, that hold-up note. They did not have that note analyzed, the F.B.I. did not. That note was available, also, for defense to inspect. They could have had that note analyzed. There was nothing preventing it. But it wasn't done. Could have taken it to a handwriting expert of their choosing. Handwriting experts will examine it. They have a service, just like lawyers are paid for their services. Handwriting experts are paid for their services, and they will give their opinion, for what it is worth. That argument works both ways. I don't care whether that handwriting matches Michael Carter or not. I don't care whether he wrote it or he had somebody write it for him. I don't care. The fact is that Michael Carter, according to the eyewitnesses, the ones who got the close look at him, Michael Carter is the one that presented that note, whoever wrote it.
LSA-C.Cr.P. art. 774 provides, as follows:
The argument shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case.
The argument shall not appeal to prejudice.
The state's rebuttal shall be confined to answering the argument of the defendant.
We observe that defendant did not request, as part of his designation of the appellate record, that defense counsel's closing argument be transcribed and that, accordingly, the record does not include a transcription of that portion of the trial. During arguments before the trial court pertaining to defense counsel's objections, the prosecutor argued that during closing argument for the defense, the defendant had questioned the state's failure to subject the note to handwriting analysis, and that the state was merely answering that argument in its closing argument in rebuttal. Because the defense did not refute or even contest the prosecutor's position, particularly after the trial court ruled that the prosecutor's statements constituted appropriate rebuttal to defense counsel's closing argument, we find that the state's rebuttal was a permissible response to defense counsel's closing argument. Hence, we conclude that the prosecutor's statements were within the scope of LSA-C.Cr.P. art. 774; and, accordingly, the trial court properly denied defendant's objections, motions and requested admonition to the jury. Contrary to defendant's assertions, the prosecutor's statements do not suggest that defendant had the burden of proving his innocence or that the state did not have to prove all the elements of the charged offense beyond a reasonable doubt. See State v. Stovall, 439 So.2d 618 (La.App. 1st Cir.1983). Cf State v. Smith, 433 So.2d *1107 688 (La.1983); State v. Stephenson, 412 So.2d 553 (La.1982).
These assignments are without merit.
ASSIGNMENT OF ERROR NO. SIX:
By means of this assignment, defendant contends that the trial court erred by imposing an excessive sentence and failing to comply with the sentencing guidelines provided in LSA-C.Cr.P. art. 894.1.
Article I, § 20, of the Louisiana Constitution prohibits the imposition of excessive punishment. Excessiveness of a sentence is a question of law which is reviewable. See State v. Sepulvado, 367 So. 2d 762 (La.1979). A sentence may be excessive either by reason of its length or because the circumstances warrant a less onerous sentencing alternative. State v. Telsee, 425 So.2d 1251 (La.1983). In other words, a sentence may be both within the statutory limits and constitutionally excessive. State v. Sepulvado, supra. A sentence is excessive when it is grossly out of proportion to the severity of the offense or nothing more than the needless and purposeless imposition of pain and suffering. To determine whether a penalty is grossly disproportionate to the crime, the court considers the punishment and the crime in light of the harm to society and whether the penalty is so disproportionate as to shock our sense of justice. State v. Bonanno, 384 So.2d 355 (La.1980). Because of the wide discretion afforded the trial court in imposing sentence, a sentence within statutory limits will not be set aside as excessive in the absence of a manifest abuse of discretion. State v. Abercrumbia, 412 So.2d 1027 (La.1982).
A trial court's reasons in imposing sentence, as required by LSA-C.Cr.P. art. 894.1, are an important aid to this Court when reviewing a sentence alleged to be excessive. State v. Christy, 509 So.2d 829 (La.App. 1st Cir.), writ denied, 513 So.2d 296 (La.1987). The trial court need not recite the entire checklist found in LSA-C.Cr.P. art. 894.1. However, the record must reflect that the court adequately considered the guidelines. State v. Davis, 448 So.2d 645 (La.1984). Even when the trial court has not complied with LSA-C.Cr.P. art. 894.1, this Court need not remand the case for resentencing, unless the sentence imposed is apparently severe in relation to the particular offender or the offense committed. State v. Davis, supra.
Armed robbery is punishable by imprisonment at hard labor for not less than five years and for not more than ninety-nine years, without benefit of parole, probation or suspension of sentence. LSA-R.S. 14:64(B). Herein, defendant was sentenced to imprisonment for a term of sixty years at hard labor, without benefit of parole, probation or suspension of sentence.
In its initial comments at sentencing, the trial court stated that it had ordered and received a presentence investigation report in this case and that it had reviewed the report. The trial court noted that, according to the report, defendant made a statement which "indicated that he was lied on and he is innocent." However, the trial court noted that Tyressa Decuir's statement (in the presentence investigation report) was consistent with her trial testimony that defendant was extremely nervous and that he stuttered continuously at the time of the commission of the instant offense. Thereupon, the trial court stated that:
The Probation Department has indicated, also, that when they interviewed you in the Parish Jail that you were nervous and that you stuttered continuously. I note also here this morning, here in court this morning, that you have stuttered. Of course, this does not mean that you're an individual that committed this offense, but, certainly, is a piece of circumstantial evidence, which tends to discredit your statement that you were lied on and are innocent. And, of course, the jury found otherwise.
On the basis of the statement quoted above, defendant contends that the trial court based his sentence on an impermissible factor, i.e., his speech impediment. In State v. Quebedeaux, 424 So.2d 1009, 1014 (La.1982), the Supreme Court noted that the sentencing record should reflect that the trial court considered "not only the *1108 seriousness of the crime and the past criminal history of the defendant, but also defendant's personal history (age, mental status, dependents, family ties, employment record, emotional and physical health) and his potential for rehabilitation." However, a trial court's opinion as to a defendant's credibility is not in and of itself an acceptable basis on which to sentence a defendant. See State v. Quebedeaux, supra; State v. Smith, 407 So.2d 652 (La.1981). Accordingly, we conclude that the trial court articulated an unacceptable basis for sentencing only insofar as it cited defendant's stuttering as being circumstantial evidence tending to discredit defendant's statement that others had lied and that he was innocent. Nonetheless, we do not find that the trial court gave undue weight to or placed undue reliance on its improperly expressed opinion as to defendant's credibility, in rendering sentence in this case. We base our finding on the entire sentencing record which shows that the trial court adequately complied with the sentencing guidelines contained in LSA-C.Cr.P. art. 894.1 and, hence, that defendant's sentence was predicated on sentencing factors properly considered under LSA-C.Cr.P. art. 894.1.
In articulating its reasons for sentencing, the trial court noted that defendant had been arrested on April 15, 1981, on charges of aggravated burglary and armed robbery of a bank and that defendant was convicted of the armed robbery and sentenced to five years imprisonment at hard labor for the offense. The trial court observed that defendant was arrested for the instant offense, another armed robbery, less than two years after being discharged from prison. The trial court noted that as a second felony offender defendant was not eligible for a probated sentence and that the judge who sentenced defendant for his first armed robbery conviction had showed leniency by imposing the minimum sentence of five years imprisonment. In additional reasons for its sentencing choice, the trial court stated the following:
I have reviewed your social history, or I should say `a lack of a social history', showing that you were born in New Orleans, Louisiana. You had nine brothers and sisters. Shortly thereafter, you moved to Baton Rouge and lived your entire life in the Baton Rouge area. You attended Scotlandville Senior High School where you completed the eleventh grade. You indicated you quit school for no good reason. You indicate that you were an average student, also attended adult education, working towards your G.E.D. You appear to be in good physical and mental condition. You deny any alcohol or drug abuse problems. You indicated that you only experienced the normal childhood diseases. As I've indicated, you do have a stuttering problem, and you indicate this occurs when you are nervous and excited. You have absolutely no past employment record. You indicate no interest of any kind, and no hobbies of any kind, no prior military experience, no assets, no resources.
In imposing sentence, the trial court made specific reference to LSA-C.Cr.P. art. 894.1. The court stated that, in relation to the number of years of imprisonment it intended to impose, defendant's conduct in this case could have caused and did threaten serious bodily harm to everyone at the scene of the armed robbery, because defendant was armed with a dangerous weapon (a gun). The court opined that defendant certainly contemplated that his criminal conduct could cause serious harm. The court noted that there was no provocation in this case tending to excuse or justify defendant's conduct and that certainly the victim did nothing to induce or facilitate the commission of the offense. The court stated that defendant's criminal conduct was the result of circumstances likely to recur, because the instant conviction was defendant's second for armed robbery. The court noted that there was nothing in defendant's character or attitude to indicate that defendant had changed in any way. In reference to whether or not imprisonment would entail excessive hardship to defendant or members of his family, the trial court stated that there was nothing in defendant's social history to show that defendant had ever done anything to support *1109 himself or any family members. In imposing the instant sentence, the court stated that a lesser sentence would deprecate the seriousness of the offense and that defendant was in need of a correctional or custodial environment that can be provided most effectively by long-term commitment to a correctional institution.
We find that the sentence imposed is not excessive under the circumstances of this case. The trial court fully considered the range of sentencing alternatives and individualized the sentence to the particular defendant for the particular crime involved.
This assignment of error is without merit.
ASSIGNMENT OF ERROR NO. SEVEN:
By means of this assignment, defendant contends that the verdict is contrary to the law and/or the evidence. In support of his contention, defendant argues that the eyewitnesses were extremely nervous during the robbery making it impossible for them to be certain as to what they saw, that the note the robber used was written on a check of another person, that there was no handwriting analysis to verify that he wrote the note, that the police never found the hat, pillowcase or the gun used in the robbery and that his fingerprints were not found on the premises of First Federal. Defendant contends that, in light of the stated factors, his conviction cannot be upheld.
The constitutional standard for testing the sufficiency of evidence, enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime charged beyond a reasonable doubt. State v. Garcia, 483 So.2d 953 (La. 1986).
As defined in LSA-R.S. 14:64, armed robbery consists of the following elements: (1) the "taking" (2) "of anything of value belonging to another" (3) "from the person of another or that is in the immediate control of another," (4) "by use of force or intimidation," (5) "while armed with a dangerous weapon."
Where the key issue is the accused's identity as the perpetrator, rather than whether the crime was committed, the state is required to negate any reasonable probability of misidentification. State v. Long, 408 So.2d 1221 (La.1982); State v. Richardson, 459 So.2d 31 (La.App. 1st Cir. 1984).
The testimony of the victim is sufficient to establish the elements of an offense. State v. Walder, 504 So.2d 991 (La.App. 1st Cir.), writ denied, 506 So.2d 1223 (La.1987). Herein, the testimony of Decuir and Winfield is sufficient to establish the elements of the instant offense and defendant's identity as the perpetrator.
Aside from the video tape of the armed robbery and the photographs made therefrom which were introduced into evidence, the testimony of Decuir and Winfield established that defendant gave Decuir a note which included a threat to her life if she activated any alarm system; that, while she was reading the note, defendant gave her a pillowcase and pointed a gun at her; that defendant told Winfield that "it's a robbery" and for him not to move; that Decuir placed about three thousand dollars inside the pillowcase; and that defendant left the premises carrying the pillowcase with the money inside it. Thereafter, on the day of the robbery, both Decuir and Winfield identified defendant as the robber in separate photographic lineups; and a few days later, on August 20, each of them again separately identified defendant at a physical lineup. Additionally, at trial, Decuir and Winfield made positive in-court identifications of defendant as the perpetrator of the offense.
This assignment is meritless.
CONVICTION AND SENTENCE AFFIRMED.