987 A.2d 98

Tavon BOMAS a/k/a Tavon Bomar

v.

STATE of Maryland.

No. 125, Sept. Term, 2008.

Court of Appeals of Maryland.

Jan. 15, 2010.

394

Marc A. DeSimone, Jr., Asst. Public Defender (Nancy S. Forster, Public Defender, of Baltimore), on brief, for petitioner.

Sarah Page Pritzlaff, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland of Baltimore), on brief for respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS, ELDRIDGE, JOHN C., (Retired, Specially Assigned), JJ.

ADKINS, J.

Petitioner, Tavon Bomas a/k/a Tavon Bomar (hereinafter "Bomar")[1] was tried and convicted in the Circuit Court for Baltimore City of second-degree murder and use of a handgun in a crime of violence. Bomar's conviction rested principally on the eyewitness identification of him by an off-duty detective. We granted his request for a writ of certiorari to review the standard by which trial judges determine whether to admit expert testimony on eyewitness identification and to decide if the Circuit Court exercised proper discretion in excluding such proffered expert testimony in this case. Although we will clarify the standard for the admission of expert testimony on eyewitness identification, we shall hold that the Circuit Court in this case properly evaluated the proffered expert testimony.

## FACTS AND LEGAL PROCEEDINGS

On April 18, 2004, at approximately 2:00 a.m., off-duty detective Kenneth Bailey stopped his truck in traffic on York Road near the Tower Lounge, a bar in Baltimore City. Bailey heard six to eight gunshots emanating from a crowd of people that had formed on the sidewalk roughly fifteen feet away from him. He observed an individual, whom he later identi-

---

**1.** Petitioner's correct surname is Bomar, though "Bomas" is a known alias. The Court of Special Appeals titled its opinion *Bomas v. State,* 181 Md.App. 204, 956 A.2d 215 (2008).

fied as Bomar, shoot at and ultimately kill a young African American male. After shooting the victim, Bomar passed within a car length of Bailey's vehicle and fled the scene. Bailey drew his weapon with the intent of pursuing Bomar but a police officer approached Bailey and requested he identify himself. After establishing his identity, both Bailey and the police officer tried, unsuccessfully, to locate Bomar. In a report Bailey filed a week later, he described the shooter simply as "a black male."

The case did not progress until October 14, 2004, when police arrested Jimmy Dower for heroin possession and he volunteered information about a shooting on York Road. Dower told police that he had been inside Tower Lounge the night of the shooting and had observed an argument between the shooter and the victim. Dower originally told police that the shooter's name was Henry Low, but he later testified that he had known Bomar as "Henry Low" for "[p]ractically all [of Bomar's] life." According to Dower, Bomar and the victim left Tower Lounge and he too went outside. Dower saw Bomar retrieve a handgun from a vacant home on York Road and fire several shots at the victim.

After Dower identified Bomar, police constructed a photo array that included Bomar's picture and showed the array to Bailey on October 26, 2004. Bailey identified Bomar as the perpetrator of the murder. Dower met with police at a 7–11 store parking lot whereupon police showed him the photo array. Dower identified Bomar's picture in the array and he signed and dated Bomar's photo. Based upon the eyewitness identifications of Bailey and Dower, police arrested Bomar on November 3, 2004. Initially Bomar claimed he was not at Tower Lounge the night of the shooting, but he later stated that he witnessed the shooting.

Bomar moved to suppress the pretrial eyewitness identifications made by Bailey and Dower. At the pretrial hearing and at trial, Dower repudiated his identification of Bomar as the shooter. He claimed a different person was the real shooter and that police had directed him towards Bomar's photo.

Dower also expressed his reluctance to testify in court and concern that he would incur a reputation as a "snitcher[.]" The motions judge found the photo array and Bailey's identification not impermissibly suggestive and denied Bomar's motion to suppress.

Bomar also proffered testimony from David Schretlen, Ph. D., an expert in the field of neuropsychology and a licensed psychologist, at a pretrial hearing. Dr. Schretlen offered testimony that (1) a "trained observer," such as a police officer, has no better ability to remember faces than a lay person, (2) a witness's confidence in his testimony is not correlated with the accuracy of his identification, (3) stress and the passage of time adversely affect one's ability to recall events or people, (4) a police photo array can influence a witness's identification of a suspect, and (5) juries tend to believe eyewitness testimonies in spite of "effective cross examination." Because Dower had recanted his identification of Bomar at trial, Bomar sought to use Dr. Schretlen's testimony to counter Bailey's identification. Bomar proffered testimony on several issues from Dr. Schretlen. On the effect of stress on memory, Dr. Schretlen offered the following:

[Schretlen]: Another factor that has been examined is the level of stress that a person is under when they're trying to encode information. Although there are some studies showing that moderate levels of stress are beneficial, there are a number of studies suggesting that extremely high levels of stress actually impede the effective encoding of to be remembered material.

* * *

Q: Has scientific research in the area of human memory address[ed] the area of the effect of a violent event upon human memory?

[Schretlen]: There's been very little data on the impact of a violent event. . . . [One study uses] soldiers who are undergoing survival skills training . . . there's a facility in which soldiers are prepared to withstand the withers of

interrogation if they're captured as prisoners of war and in that, in that survival skills training, they are exposed to both stressful, high stressful and low stress interrogation techniques and [the study] has shown that people are much better at remembering the faces of interrogators who interrogate them in a low stress fashion compared to interrogators who interrogate them in a high stress fashion and there are a number of such studies showing that when people are under high levels or exposed to high levels of stress, their memory is actually not as good as it is when they are under you know a sort of ordinary level, experiencing an ordinary level of arousal[.]

\* \* \*

I don't think people appreciate that high levels of stress might actually impair memory rather than foster it as you gave an example, I think, of the person who says I was so frightened, I'll never forget that face.

\* \* \*

Q:  Now, with regard to stress, isn't it true that the studies seem to indicate both sides of it?  There are some studies that say high levels of stress will indicate a lower encoding of memories correct?

[Schretlen]: Relatively few studies of very high levels of stress.  The studies that I have seen of very high levels of stress ... more consistently suggest that it impedes encoding.  Studies of sort of lower levels of stress suggest that when you go from an extremely low level to a moderate level, that can actually be beneficial[.]

\* \* \*

Q:  Would you agree with me doctor that someone holding a gun on you would be a high level of stress?

[Schretlen]: It depends on the individual.

* * *

[P]eople experience different levels of fear, or arousal, or distress in response to the same event and what the studies suggest is that people who ... experience very high levels of arousal are more likely to have problems encoding a new memory.

* * *

Q:   [W]ould you agree with me that it's generally less stressful to witness a gun on someone else than having a gun on you as an individual?

[Schretlen]:  I think that stands to reason.

Q:   So arguably, someone who is watching ... someone holding a gun on someone else, would conceivably be under less levels of stress than that person having a gun held on them personally, correct?

[Schretlen]:  Very possibly.

Q:   And if you add to it the fact that ... the person is a 20–year military person [who is] trained in guns and gunfire and then also a person who is a trained law enforcement officer, conceivably that level of stress could be even less, correct?

[Schretlen]:  It certainly is a possibility[.]

* * *

Q:   [In regard to the study of the soldiers being interrogated under high stress and low stress situations, the soldiers] are the focus of the stress.  The stress is happening to them, correct?

[Schretlen]:  Yes.

Q:   Can you cite me any studies in which that particular scenario is involved where people are watching the interrogation?

[Schretlen]:  No.

With respect to the storage of information within human memory, Dr. Schretlen offered the following:

Q: And can you explain what the research has shown, what the scientific research has shown in regards to human memory and the storing of information?

[Schretlen]: Well the major finding in that area, Your Honor, is [that] the longer information is stored, the more it tends to break down. But again, what's not so intuitive about this is that the forgetting curve is just that, a curve. It's not a straight line. That is we forget the most information in the few seconds or minutes after we're exposed to it and we forget less and less of the material as time goes by.

* * *

Q: And in regards to human memory ... there are some who may say that these issues are a matter of common sense. Do you have an opinion ... ?

[Schretlen]: I think some of them are a matter of common sense but there are a number of findings that are actually somewhat counter intuitive.

Q: Of the ones that are counter intuitive, which ones are they in particular?

[Schretlen]: I don't think people appreciate that the relationship between exposure time ... and memory encoding accuracy ... is a curvilinear relationship[.]

Q: What about ... in regards to ... your expert testimony that the longer information is stored in fact relates [to] the breakdown of that information?

[Schretlen]: Well, I think all—I think people would pretty widely recognize that the more time between when you learn something and when you're asked to remember it, the less likely you'll remember it. So, I'm saying I think that is actually fairly intuitive.

In regard to the memory ability of a "trained observer," Dr. Schretlen testified as follows:

[Schretlen]: By and large there have been at least early on a number of studies comparing Public Safety Officials, police officers and other sort of lay persons in their ability to remember faces or staged events and it doesn't appear

that police officers have any particular advantage over a non—over lay persons.

Q: So in your expert opinion, the research that has been conducted it has not shown that trained observers as the police officer is more accurate than a non-trained person?

[Schretlen]: In general that's the case. There are certainly some studies showing that police officers tend to be a little bit better at recording peripheral details but they're not typically better at remembering faces.

The motions judge declined to allow this testimony because she felt it would be unhelpful to a jury and that a jury was capable of appropriately evaluating and weighing the eyewitness identifications. In reaching its decision, the Circuit Court stated:

I have not found that his testimony in this case will be helpful to the jury in evaluating the evidentiary issues presented with respect to the two eyewitness identifications.... With respect to ... Bailey, Defense counsel through cross examination will have an opportunity to probe the officer's ability to observe, remember, and recall the event in question including the officer's ability to pay attention and any distraction the officer was under.... Mr. Dower has already testified that he knows the Defendant[.] ... Thus, Mr. Dower's identification of the Defendant in a photographic array did not depend on his ability to encode, store, or retrieve the face of a stranger. Indeed on cross examination, Dr. Schretlen candidly admitted that his entire direct examination would not pertain to a situation in which an identification [wa]s made by a witness when the person being identified is known to the witness.... [The shooting] was a violent event for which the expert witness has no data showing the impact of circumstances or the ability to encode, store, and retrieve information in the human memory.... The doctor has no studies or data to present in which a witness has been tested for the events of observing a stressful intervention or action.... The doctor further testified that every individual would experience a different level of stress[.]

* * *

> [W]ith respect to the testimony of the doctor on police officer or trained observers' reactions with respect to human memory, the doctor gave little to no testimony on direct. There was one question asked by the Defense attorney as to whether the studies differed or what the studies showed about police officers. The doctor responded in a generality that there have been some studies that have been shown that there is no appreciable difference in the reaction [by] police officers or trained observers [compared to] the other members of the public ... [I]n coming to that conclusion ... we don't have[:] the identification of these studies, ... the names of them[;] ... the number of studies that he's talking about with respect to police officers[;] ... a description of what these studies consisted of[; or] ... the dates of the discoveries of the studies.... So with respect to the observing ability of a police officer, we have little to no information in terms of data or expert opinion from the doctor to even apply to [this witness].

The judge allowed the prosecution to introduce into evidence the eyewitness identifications made by Dower and Bailey.

At Bomar's trial, Bailey testified for the State and identified Bomar as the shooter. Bailey authenticated the photographic array that was shown to him on October 26, 2004, from which he had identified and signed Bomar's photo. Through cross-examination of Bailey, Defense counsel probed the following issues: (1) Bailey had been coming from a nightclub (Melba's); (2) he drank a 12–16oz. beer at Melba's; (3) his truck's radio was on when the shooting occurred; (4) there was a SUV approximately the same size as Bailey's truck two cars in front of him on York Road; and (5) when Bailey exited his vehicle he was cautious and apprehensive.

Dower testified that Bomar was in fact not the person he had seen at the shooting and refused to implicate him in the crime; but, he admitted he had told the police that Bomar was the shooter. Dower testified the shooter was a man with "deep dimples" and that police had instructed him what to say

during his taped interview and directed him to Bomar's picture in the photo array. Dower alleged that he had identified Bomar as the shooter and from the photo array because he has poor eyesight, the sun was in his eyes, and he was experiencing heroin withdrawal symptoms.

The jury subsequently convicted Bomar of second degree murder and use of a handgun during the commission of a crime of violence or felony. The judge sentenced Bomar to imprisonment of thirty years for second degree murder and twenty years for the use of a handgun in a crime of violence, which terms were to be served consecutively.

Bomar appealed the judgment to the Court of Special Appeals ("CSA") challenging the Circuit Court's exclusion of Dr. Schretlen's expert testimony on grounds that it would not have been helpful to a jury; the intermediate appellate court affirmed. *Bomas v. State*, 181 Md.App. 204, 956 A.2d 215 (2008). We granted Bomar's Petition for Writ of Certiorari to consider the following two questions: (1) should this Court reconsider its decision in *Bloodsworth v. State*, 307 Md. 164, 512 A.2d 1056 (1986), and adopt a standard that favors the admissibility of expert testimony on eyewitness memory identification in criminal cases where the State's primary evidence of guilt is an eyewitness identification of the accused, and (2) did the trial court improperly exercise its discretion in finding that testimony from an expert in the fields of neuropsychology and human memory would not be helpful to the jury in evaluating eyewitness identifications of the defendant? Bomar asks us to answer each question in the affirmative.

## DISCUSSION

### I.

### The Standard for Expert Testimony on Eyewitness Identification

Under Maryland Rule 5–702,

Expert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testi-

mony will assist the trier of fact to understand the evidence or to determine a fact in issue. In making that determination, the court shall determine (1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony.

Although decided before our adoption of Rule 5–702,[2] in *Bloodsworth v. State*, 307 Md. 164, 512 A.2d 1056 (1986), we applied a substantially similar common law rule, doing so specifically in the context of the admissibility standard for, and the extent of courts' discretion in, allowing or excluding expert testimony on eyewitness identifications. Bloodsworth was convicted of first degree murder and related sexual offenses largely on the strength of eyewitness testimony. *Id.* at 166–70, 512 A.2d at 1057–59. Similar to Bomar, Bloodsworth argued that the trial court erred in refusing to allow an expert witness to testify about the shortcomings of eyewitness identification. *Id.* at 177, 512 A.2d at 1062–63. The expert witness in *Bloodsworth* offered to testify to the following:

> ... I would only be estimating what the research shows. I don't have a particularly overall general condemnation of eye witnesses at issue.
>
> * * *
>
> [E]ye witnesses are really confronted with a difficult situation, and when the circumstances add up to a very difficult challenge to the memory system, these are things that can happen to various parts of their testimony and various parts of their identification, and testing methods ... I see as simply a tool, and the checklist is ... provided to the jury so that they can essentially assess what ... the filter of the scientist would say about a given test.

2. Maryland Rule 5–702 was adopted on December 15, 1993 as part of a new code of evidence, and became effective July 1, 1994.

*Id.* at 177–78, 512 A.2d at 1062. The trial judge excluded the expert's testimony stating:

I am concerned [about] the possibility [that] admitting the evidence would tend to confuse or mislead the jury. This is not just a matter of usurping the province of the jury, although it is in my judgment most certainly that, it is also that such testimony is of little value in aiding the jury in this case. I'm not persuaded that the testimony will be helpful to the jury in understanding the evidence in this case.

\* \* \*

It seems to me that the reliability of the witnesses and the identification witnesses is better tested by the cathartic effect of cross-examination than by the opinion of an expert. *Id.* at 178, 512 A.2d at 1063. The trial judge also concluded that the proffered testimony failed the *Frye–Reed* test [3] because the defense failed to present evidence showing that the expert testimony on eyewitness identification "has general acceptance in the relevant scientific community." *Id.* at 179, 512 A.2d at 1063. Finally, the trial judge held:

[E]ven if it were a technique generally accepted in the relevant scientific community, the proffer is not sufficient to persuade me first, exactly what is being offered to the jury other than some generalized explanation of the studies that

---

**3.** The *Frye–Reed* test originated from two cases: *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923), *superseded by* FED.R.EVID. 702, and *Reed v. State*, 283 Md. 374, 391 A.2d 364 (1978). *Frye* held that courts may admit expert testimony if it is based on a scientific principle or discovery that has general acceptance in the scientific community. 293 F. at 1014. The principle expressed in *Frye* became incorporated into Maryland law with the *Reed* decision. This Court held,

before a scientific opinion will be received as evidence at trial, the basis of that opinion must be shown to be generally accepted as reliable within the expert's particular scientific field. Thus, according to the *Frye* standard, if a new scientific technique's validity is in controversy in the relevant scientific community, or if it is generally regarded as an experimental technique, then expert testimony based upon its validity cannot be admitted into evidence.

*Reed*, 283 Md. at 381, 391 A.2d at 368.

have been made. Nothing that has been proffered suggests that it will be helpful.

\* \* \*

[I]t may usurp the jury's province in determining the reliability of the identification in this case. . . .

*Id.* at 179, 512 A.2d at 1063. We upheld the trial judge's decision to exclude the expert's testimony but remanded the case to the Circuit Court due to *Brady* violations.[4] *Bloodsworth*, 307 Md. at 171–76, 512 A.2d at 1067.

In addition, we held "that the *Frye–Reed* test was not properly applicable to [expert testimony on eyewitness identification.]" *Id.* at 184, 512 A.2d at 1066. In upholding the decision we held that the proper standard for the admissibility of expert testimony on eyewitness reliability is " 'whether [the expert's] testimony will be of real appreciable help to the trier of fact in deciding the issue presented.' " *Id.*, 512 A.2d at 1066 (*quoting Shivers v. Carnaggio*, 223 Md. 585, 165 A.2d 898 (1960)). Further, we held that " '[t]he admissibility of expert testimony is a matter largely within the discretion of the trial court, and its action in admitting or excluding such testimony will seldom constitute a ground for reversal.' " *Bloodsworth*, 307 Md. at 185, 512 A.2d at 1067 (*quoting Raithel v. State*, 280 Md. 291, 372 A.2d 1069 (1977)).

---

4. In *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963), the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." In *Bloodsworth*, the defendant filed a discovery motion requesting the identity of other possible police suspects, information on photo spreads or reports to law enforcement authorities suggesting someone other than the defendant had committed the crime, and all the police officers' notes for this case. *Bloodsworth v. State*, 307 Md. 164, 171, 512 A.2d 1056, 1060 (1986). Subsequently, a report from a detective regarding another possible suspect was not made available to Bloodsworth until sometime between the trial and the sentencing phase. *Id.* at 172, 512 A.2d at 1060. We held that the fact that the prosecution was not in physical possession of the report was "immaterial" and that the "undisclosed report is sufficient to undermine confidence in the outcome of the trial." *Id.* at 174–76, 512 A.2d at 1060–61.

Bomar now urges us to reevaluate the standard adopted in *Bloodsworth* regarding expert testimony on eyewitness identification. He argues that such expert testimony should be presumptively admissible, or at least be favored, especially in cases like this one, where eyewitness testimony forms the foundation of the State's case. For this proposition, he argues that (1) *Bloodsworth* discouraged the admission of expert testimony on eyewitness identification; (2) many wrongful convictions are due to eyewitness misidentifications, causing many jurisdictions to favor the admissibility of expert testimony on the reliability of eyewitness identifications; and (3) expert testimony on eyewitness identification should be presumptively helpful and under this standard the trial judge erred in not admitting the proffered expert testimony.

Before assessing Bomar's arguments, we first look for guidance from other jurisdictions that have grappled with how to handle expert testimony on eyewitness identification. In *McMullen v. State*, 714 So.2d 368, 370–71 (Fla.1998), the Supreme Court of Florida divided the various jurisdictional approaches on this issue into categories, "discretionary" and "prohibitory." The discretionary approach grants the trial court discretion as to whether to admit such testimony and appears to be the majority view on both the federal [5] and state [6] levels that have considered the question. *Id.* at 370.

---

**5.** *See United States v. Rodriguez–Berrios,* 573 F.3d 55, 71–72 (1st Cir. 2006); *United States v. Brownlee,* 454 F.3d 131, 141–44 (3d Cir.2006); *United States v. Martin,* 391 F.3d 949, 954 (8th Cir.2004); *United States v. Lumpkin,* 192 F.3d 280, 288–89 (2d Cir.1999); *United States v. Hall,* 165 F.3d 1095, 1104–1106 (7th Cir.1999); *United States v. Smith,* 156 F.3d 1046, 1052–54 (10th Cir.1998); *United States v. Rincon,* 28 F.3d 921, 926 (9th Cir.1994); *United States v. Harris,* 995 F.2d 532, 534–35 (4th Cir.1993).

**6.** *See Ex parte Williams,* 594 So.2d 1225, 1226–27 (Ala.1992); *Jones v. State,* 314 Ark. 289, 862 S.W.2d 242, 244 (1993); *State v. McClendon,* 248 Conn. 572, 730 A.2d 1107, 1115 (1999); *Green v. United States,* 718 A.2d 1042, 1050–55 (D.C.1998); *McMullen v. State,* 714 So.2d 368, 370–72 (Fla.1998); *People v. Enis,* 139 Ill.2d 264, 151 Ill.Dec. 493, 564 N.E.2d 1155, 1161–63 (1990); *State v. Gaines,* 260 Kan. 752, 926 P.2d 641, 646–49 (1996); *State v. Rich,* 549 A.2d 742, 743–44 (Me.1988); *Commonwealth v. Santoli,* 424 Mass. 837, 680 N.E.2d 1116, 1118–21

Other jurisdictions embrace a discretionary approach generally, but either require or favor the admission of expert testimony on eyewitness identification when the prosecution's case relies solely on eyewitness testimony.[7] Some jurisdictions appear to generally disfavor expert testimony on eyewitness identification, but favor it when the State has no substantial corroborating evidence.[8] Finally, there is a prohibitory approach which excludes all expert testimony on eyewitness identification. To our knowledge, only three jurisdictions have retained this *per se* exclusion.[9] *Id.* at 371.

---

(1997) (applying abuse of discretion standard while offering some suggestion that it would favor the admission of expert testimony when the State has no other corroborating evidence); *State v. Barlow,* 541 N.W.2d 309, 313 (Minn.1995); *White v. State,* 112 Nev. 1261, 926 P.2d 291, 292 (1996); *State v. Knox,* 78 N.C.App. 493, 337 S.E.2d 154, 156–57 (1985); *State v. Sabetta,* 680 A.2d 927, 932–33 (R.I.1996); *State v. Copeland,* 226 S.W.3d 287, 298–300 (Tenn.2007); *Rodriguez v. Commonwealth,* 20 Va.App. 122, 455 S.E.2d 724, 726–28 (1995); *State v. Percy,* 156 Vt. 468, 595 A.2d 248, 252–53 (1990); *State v. Hernandez,* 58 Wash.App. 793, 794 P.2d 1327, 1331–33 (1990), *disapproved of on other grounds, State v. Kjorsvik,* 117 Wash.2d 93, 812 P.2d 86 (1991); *Engberg v. Meyer,* 820 P.2d 70 (Wyo.1991).

**7.** *See United States v. Smithers,* 212 F.3d 306, 317 (6th Cir.2000) (discretionary standard but should be admitted when there is no other inculpatory evidence); *Skamarocius v. State,* 731 P.2d 63, 65–67 (Alaska Ct.App.1987); *People v. Jones,* 30 Cal.4th 1084, 135 Cal.Rptr.2d 370, 70 P.3d 359, 374–75 (2003); *People v. Campbell,* 847 P.2d 228, 232–35 (Colo.Ct.App.1992); *Johnson v. State,* 272 Ga. 254, 526 S.E.2d 549, 552–53 (2000); *State v. Wright,* 147 Idaho 150, 206 P.3d 856, 861–64 (2009); *Commonwealth v. Christie,* 98 S.W.3d 485, 488 (Ky.2002); *State v. Carter,* 522 So.2d 1100, 1109 (La.App.1988) ("Where the key issue is the accused's identity as the perpetrator, rather than whether the crime was committed, the state is required to negate any reasonable probability of misidentification.") (citations omitted); *State v. LeGrand,* 8 N.Y.3d 449, 835 N.Y.S.2d 523, 867 N.E.2d 374, 375–76 (2007); *State v. Whaley,* 305 S.C. 138, 406 S.E.2d 369, 371–72 (1991). Other jurisdictions may fall in this category, but have not yet confronted the question of whether expert testimony should be admissible when no other corroborating evidence exists.

**8.** *See United States v. Alexander,* 816 F.2d 164, 167 (5th Cir.1987), *cert. denied,* 493 U.S. 1069, 110 S.Ct. 1110, 107 L.Ed.2d 1018 (1990) (generally inadmissible except when the case depends primarily on eyewitness identification); *State v. Chapple,* 135 Ariz. 281, 660 P.2d 1208, 1223–23 (1983).

**9.** *See United States v. Smith,* 122 F.3d 1355, 1357–59 (11th Cir.1997); *State v. Goldsby,* 59 Or.App. 66, 650 P.2d 952, 953–54 (1982); *Commonwealth v. Simmons,* 541 Pa. 211, 662 A.2d 621, 630–31 (1995).

Bomar argues that *Bloodsworth* discourages the admission of expert testimony on eyewitness identification because "the opinion advances all the arguments against the admissibility of expert testimony, and provides no countervailing observations which would educate trial judges as to circumstances in which expert testimony on eyewitness reliability would be helpful." To support his argument, Bomar draws attention to our observation in *Bloodsworth* that, "[t]he vast majority of courts have rejected [expert testimony on eyewitness identification,]" *id.* at 181, 512 A.2d at 1064, and the Court's reliance on *United States v. Amaral*, 488 F.2d 1148 (9th Cir.1973), and *State v. Porraro*, 121 R.I. 882, 404 A.2d 465 (1979), two cases that upheld the exclusion of such evidence. We quoted *Amaral* for the proposition that " '[o]ur legal system places primary reliance for the ascertainment of truth on the test of cross-examination' " and that " '[i]t is the responsibility of counsel during cross-examination to inquire into the witness' [sic] opportunity for observation, his capacity for observation, his attention and interest and his distraction or division of attention.' " *Bloodsworth*, 307 Md. at 182, 512 A.2d at 1065 (*quoting Amaral*, 488 F.2d at 1153) (citations omitted). We also referenced *Porraro*, in which the Supreme Court of Rhode Island upheld the trial judge's exclusion of a psychology professor's testimony on eyewitness identification because of a fear " 'it would effectively invade the province of the jury' " and that " 'admitting this testimony would open a floodgate whereby experts would testify on every conceivable aspect of a witness' [sic] credibility.' " *Bloodsworth*, 307 Md. at 183, 512 A.2d at 1065 (*quoting Porraro*, 404 A.2d at 471). We then quoted the following holding in *Porraro*, which was similar to the decision in *Amaral:*

"We are persuaded that the subject matter of the proffered testimony in this case, the trustworthiness in general of eyewitness observations, was not beyond the ken of the jurors and therefore the trial justice did not abuse his

discretion in excluding this evidence. Through cross-examination, defense counsel was able to probe into the witness' [sic] capacity and opportunity for observation, her attention, interest and distraction. The jury was perfectly capable of assessing the witness' [sic] credibility by weighing the inconsistencies and deficiencies elicited in cross-examination."

*Bloodsworth,* 307 Md. at 183, 512 A.2d at 1065 (*quoting Porraro,* 404 A.2d at 465). We agree with Bomar that the *Bloodsworth* opinion strikes a negative tone with respect to expert testimony on eyewitness identification. But this does not mean that *Bloodsworth* was wrongly decided or that we should depart from the "real appreciable help" to the jury standard for admission that was applied in that case. We will be sure, though, to carefully examine the record here to ascertain whether that negative tone influenced the trial court's ruling excluding Dr. Schretlen's testimony.

First we consider Bomar's thesis that such expert testimony should be presumptively admissible. Quoting an article published in an American Bar Association journal, Richard S. Schmechel, et al., *Beyond the Ken? Testing Jurors' Understanding of Eyewitness Reliability Evidence,* 46 JURIMETRICS 177, 184, Bomar defends his "presumptively admissible" theory by arguing that the standard of review for trial judges' decisions on expert testimony is " 'vacuous[,]' " makes a lower court's decision " 'de facto final' " or grants the lower court "unfettered" discretion, and "insulates the decision not to allow such experts within an extremely deferential standard of review." Bomar points out that the trial judge in *Bloodsworth,* on remand, again precluded the expert testimony he sought to introduce and again a jury convicted Bloodsworth of murder primarily on the basis of eyewitness identification. *See Bloodsworth v. State,* 76 Md.App. 23, 33, 543 A.2d 382, 387 (1988). He observes, moreover, that DNA testing in 1993 exonerated Bloodsworth of this crime. *See* The Innocence Project, *Know the Cases: Kirk Bloodsworth,* http://www. innocenceproject.org/Content/54.php (last visited Jan. 04, 2010).

Bomar's second contention is that the volume of wrongful convictions based on eyewitness misidentifications impels this Court to encourage the admission of expert testimony on eyewitness identification. Bomar predicates his argument on studies showing that a substantial number of individuals who were convicted of a crime, but later exonerated by DNA evidence, were mistakenly identified by at least one eyewitness. For example, the Third Circuit in *United States v. Brownlee* reviewed literature on eyewitness reliability and observed:

The recent availability of post-conviction DNA tests demonstrate that there have been an overwhelming number of false convictions stemming from uninformed reliance on eyewitness misidentifications. In 209 out of 328 cases (64%) of wrongful convictions identified by a recent exoneration study, at least one eyewitness misidentified the defendant. In fact, mistaken eyewitness identifications are responsible for more wrongful convictions than all other causes combined.

454 F.3d 131, 141–42 (3d Cir.2006) (internal quotation marks and citations omitted); *see also State v. Copeland,* 226 S.W.3d 287, 299–300 (Tenn.2007) (reviewing literature addressing limitations of eyewitness identification evidence); The Maryland Commission on Capital Punishment, *Final Report to the General Assembly* 64, Dec. 12, 2008 (citing the prevalence of erroneous eyewitness identifications and subsequent wrongful convictions as a reason to abolish the death penalty in Maryland); The Innocence Project, *Fact Sheet on Post–Conviction DNA Exonerations, available at* http://www.innocenceproject. org/news/Fact-Sheets.php (finding that "Eyewitness [m]isidentification [t]estimony was a factor in 74 percent of post-conviction DNA exoneration cases in the U.S.") (last visited Jan. 04, 2010).

Bomar maintains that because of the apparently frequent convictions based on eyewitnesses' misidentifications, "[o]ther jurisdictions have tempered the judicial hostility towards admitting ... expert testimony on eyewitness reliability in vogue when *Bloodsworth* was decided, and the decisive trend now

recognizes that expert testimony on eyewitness reliability is a necessary safeguard against wrongful conviction." He argues that the majority of cases treat expert testimony on eyewitness reliability as "presumptively helpful to the jury" when the State's case is based primarily on eyewitness testimony. In support of this trend, Bomar offers *United States v. Smithers*, 212 F.3d 306 (6th Cir.2000); *Johnson v. State*, 272 Ga. 254, 526 S.E.2d 549 (2000); and *Copeland*, 226 S.W.3d at 301.

In *Smithers*, the Sixth Circuit considered whether the district court abused its discretion in refusing to allow an expert on eyewitness identification. In examining the means by which courts consider such testimony, the court appraised the development of expert testimony on eyewitness reliability as follows:

Courts' treatments of expert testimony regarding eyewitness identification has experienced a dramatic transformation in the past twenty years and is still in a state of flux. Beginning in the early 1970's, defense attorneys began to bring expert testimony into the courtroom. Then, courts were uniformly skeptical about admitting such testimony, elaborating a host of reasons why eyewitness experts should not be allowed to testify.

* * *

This trend shifted with a series of decisions in the 1980's, with the emerging view that expert testimony may be offered, in certain circumstances, on the subject of the psychological factors which influence the memory process.... This jurisprudential trend is not surprising in light of modern scientific studies which show that, while juries rely heavily on eyewitness testimony, it can be untrustworthy under certain circumstances.

Recognizing the dichotomy between eyewitness errors and jurors' reliance on eyewitness testimony, this Circuit has held that expert testimony on the subject of eyewitness identification is admissible.

212 F.3d at 311–12 (citations and footnote omitted). The *Smithers* court held that the district court improperly excluded the proffered expert testimony because (1) the district judge excluded the expert's testimony because it "makes it a more interesting case" and (2) the district court failed to follow established guidelines for admitting such evidence.[10] *Id.* at 314–15. The Sixth Circuit also held that "expert testimony should be admitted in the precise situation presented to the trial court in this case-that is, when there is no other inculpatory evidence presented against the Defendant with the exception of a small number of eyewitness identifications." *Id.* at 317.

Bomar maintains that the reliability of eyewitness testimony is beyond the ken of jurors, citing *Smithers*, 212 F.3d at 312 n.

---

**10.** In its analysis, the Sixth Circuit applied the test adopted in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and *Kumho Tire Company v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999):

*Daubert* thus requires trial courts to perform a two-step inquiry. First, the court must determine whether the expert's testimony reflects scientific knowledge, that is, the court must make a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue. Second, the court must ensure that the proposed expert testimony is relevant to the task at hand and will serve to aid the trier of fact.

\* \* \*

The Supreme Court in *Kumho* indicated that the standards set forth in *Daubert*, depending on the particular circumstances of the particular case, should be flexibly applied.

\* \* \*

While it is true that several post-*Daubert* eyewitness identification cases have found that the exclusion of the testimony was not an abuse of discretion ... the lesson from these cases is not that expert testimony on eyewitness identification is never appropriate; rather, the cases indicate that courts must consider whether the testimony would be helpful or confusing to the jury.

\* \* \*

Although the decision of whether to admit a witness's testimony is left to the sound discretion of the trial court, a trial court cannot make an arbitrary decision.

*Smithers*, 212 F.3d at 313–15 (internal quotation marks and citations removed).

1, 316, which states that "[t]oday, there is no question that many aspects of perception and memory are not within the common experience of most jurors, and in fact, many factors that affect memory are counter-intuitive" and that "[j]urors tend to overestimate the accuracy of eyewitness identifications because they often do not know the factors they should consider when analyzing this testimony." Bomar reiterates, citing *Copeland*, that expert testimony is needed to sensitize jurors to eyewitness errors:

> [R]esearch over the past thirty years has shown that expert testimony on memory and eyewitness identification is the only legal safeguard that is effective in sensitizing jurors to eyewitness errors. Studies have shown that erroneous identification accounted for as much as eighty-five percent of the convictions of those individuals later exonerated by DNA testing.

> \* \* \*

> Further, the research also indicates that neither cross-examination nor jury instructions on the issue are sufficient to educate the jury on the problems with eyewitness identification. . . .

*Copeland*, 226 S.W.3d at 299–300 (quotation marks and citations omitted); *see also Brownlee*, 454 F.3d at 141–42 (reviewing literature and stating that " 'jurors seldom enter a courtroom with the knowledge that eyewitness identifications are unreliable' ") (citations omitted).

Bomar's third argument calls for us to consider expert testimony on eyewitness identification presumptively helpful in cases where there is no other evidence to corroborate the eyewitness identification. For this proposition, Bomar relies on two cases: *Johnson*, 526 S.E.2d at 549, and *State v. LeGrand*, 8 N.Y.3d 449, 835 N.Y.S.2d 523, 867 N.E.2d 374 (2007). According to Bomar, in *Johnson*, the Supreme Court of Georgia adopted a presumptive admissibility standard for expert opinion on eyewitness testimony where a state's case

against a defendant rests primarily on the eyewitness identification, in holding:

> Where eyewitness identification of the defendant is a key element of the State's case and there is no substantial corroboration of that identification by other evidence, trial courts may not exclude expert testimony without carefully weighing whether the evidence would assist the jury in assessing the reliability of eyewitness testimony and whether expert eyewitness testimony is the only effective way to reveal any weakness in an eyewitness identification. However, the admission or exclusion of this evidence lies within the sound discretion of the trial court, whose decision will not be disturbed on appeal absent a clear abuse of discretion.

526 S.E.2d at 552–53 (quotation marks and citations and omitted). Similarly in *LeGrand,* the Court of Appeals of New York held:

> [W]here the case turns on the accuracy of eyewitness identifications and there is little or no corroborating evidence connecting the defendant to the crime, it is an abuse of discretion for a trial court to exclude expert testimony on the reliability of eyewitness identifications if that testimony is (1) relevant to the witness's identification of defendant, (2) based on principles that are generally accepted within the relevant scientific community, (3) proffered by a qualified expert and (4) on a topic beyond the ken of the average juror.... [T]rial courts generally have the power to limit the amount and scope of evidence presented....

835 N.Y.S.2d 523, 867 N.E.2d at 375–76.

Bomar believes a standard where expert testimony is presumptively helpful to a jury will strike "the proper balance between the trial judge's traditional discretion in evaluating the admissibility of evidence and providing a proper safeguard against wrongful conviction." Under Bomar's proposed standard, "[t]rial judges would still have discretion to exclude the testimony, but only if the party seeking to exclude the expert demonstrates that the opinions are not helpful because they do

not pertain to the situation at hand." Bomar also argues this standard would be consistent with *Bloodsworth*, though the end result would differ, and with Maryland Rule 5–401, which defines relevant testimony.[11]

We agree with Bomar that jurisdictions have trended toward the admissibility of expert testimony on eyewitness reliability and we recognize that scientific advances since *Bloodsworth* may assist juries in evaluating eyewitness testimony. We appreciate that scientific advances have revealed (and may continue to reveal) a novel or greater understanding of the mechanics of memory that may not be intuitive to a layperson. Thus, it is time to make clear that trial courts should recognize these scientific advances in exercising their discretion whether to admit such expert testimony in a particular case.

Nonetheless, some of the factors of eyewitness identification are not beyond the ken of jurors. For example, the effects of stress or time are generally known to exacerbate memory loss and, barring a specific set of facts, do not require expert testimony for the layperson to understand them in the context of eyewitness testimony. In recognition of this, we believe, consistent with our past holdings, that a flexible standard that can properly gauge the state of the scientific art in relation to the specific facts of the case is best.

Accordingly, notwithstanding the negative tone of the *Bloodsworth* decision, the substantive standard for admissibility set forth was not wrong, and indeed is consonant with the current majority view. Thus, we reiterate the following test for the admissibility of expert testimony on eyewitness identification: " 'whether his [or her] testimony will be of real appreciable help to the trier of fact in deciding the issue presented[;]' " the application of this test is " 'a matter largely

---

**11.** Maryland Rule 5–401 defines "relevant evidence" as evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

within the discretion of the trial court[.]'" *Bloodsworth,* 307 Md. at 184, 185, 512 A.2d at 1066, 1067 (citations omitted). This standard comports with the general rule on expert testimony set forth in Rule 5–702.[12]

█ The trial court's discretion is sufficiently circumscribed by Maryland Rule 5–702, which outlines specific criteria to determine whether to admit the proffered expert testimony. We decline Bomar's proposed standard because we do not want to hamper the trial court's ability to evaluate proffered expert testimony on a case-by-case basis. Despite the increased acceptance of such evidence, most jurisdictions have not embraced a presumption of admissibility. Rather, the trend has largely been one of jurisdictions abandoning blanket exclusion of such expert testimony.[13] A trial judge must have

---

**12.** The applicability of *Frye–Reed* to expert testimony on eyewitness identification was not argued or decided by the court below. As noted earlier, *Bloodsworth* disallowed the application of *Frye–Reed* to this type of evidence because that test had only been applied in limited circumstances. 307 Md. at 184, 512 A.2d at 1066 ("Our own use of what we denominate as the *Frye–Reed* test has been confined to 'voice prints' in *Reed* and to hypnosis[.]"). Since *Bloodsworth,* we have applied the *Frye–Reed* test to other types of evidence. *See Blackwell v. Wyeth,* 408 Md. 575, 585–93, 971 A.2d 235, 242–45 (2009) (applying *Frye–Reed* to expert testimony concerning the causal connection between thimerosol-laden vaccines and autism and reviewing cases involving *Frye–Reed's* application to testimony concerning statistical methods, Comparative Bullet Lead Analysis, and biotoxic illness). Other jurisdictions have applied this test or the *Daubert* test to expert testimony on eyewitness identification and have found such evidence to be admissible. *See, e.g., LeGrand,* 867 N.E.2d at 380–81. We do not address the applicability of *Frye–Reed* to the testimony offered in this case.

**13.** For example, the Supreme Court of Tennessee in *Copeland* overturned the precedent it set in *State v. Coley,* 32 S.W.3d 831, 833–38 (Tenn.2000), stating, "we have chosen to overrule *Coley's* conclusion that no one, regardless of credentials or experience and no matter how questionable the evidence, can provide testimony on the issue of eyewitness identification[.]" 226 S.W.3d at 301. The *Copeland* court did not, however, recognize a presumptive admissibility standard for testimony on eyewitness identification, though it noted scientific advances that may provide some insight to eyewitness identification. The Supreme Court of Georgia in *Johnson,* moreover, rejected a *per se* exclusion of expert testimony on eyewitness identification and then declined to adopt a standard "that a trial court necessarily abuses its discretion by

the ability to determine whether proffered testimony has a credible foundation and is relevant to the facts of a given case. Rule 5–702 entrusts the trial court with the task of determining whether an expert is qualified to give testimony about an issue, whether there is a foundation for the expert's proffered testimony, and the relevance of the proffered testimony. We see no reason to shift the burden of demonstrating the Rule 5–702 elements away from the one who presents the expert to the court.

Expert testimony is not the only means to educate juries about the vagaries of eyewitness testimonies and safeguard against wrongful convictions based on misidentifications. In some cases, other trial components such as cross-examination, closing arguments, and jury instructions, can. provide the jury with sufficient information to evaluate the reliability of eyewitness identifications. Indeed, it might be an appropriate time for the Maryland Criminal Pattern Jury Instruction Committee to evaluate whether its current rule on witnesses (MPJICr 3:10) should be modified in light of the studies about eyewitness testimony, and the scientific advances in this area.[14]

---

refusing to admit qualified, pertinent expert testimony in any case where no substantial evidence exists to corroborate eyewitness identification testimony." 526 S.E.2d at 552. The *Johnson* court merely suggested that if there is no other corroborating evidence, "trial courts may not exclude expert testimony without *carefully weighing* whether the evidence would assist the jury in assessing the reliability of eyewitness testimony and whether expert eyewitness testimony is the only effective way to reveal any weakness in an eyewitness identification." *Id.* at 552 (emphasis added).

14. Maryland Criminal Pattern Jury Instruction (MPJI–Cr) 3:10 addresses the credibility of witnesses:

You are the sole judge of whether a witness should be believed. In making this decision, you may apply your own common sense and every day experiences.

* * *

You should consider such factors as:
(1) the witness's behavior on the stand and manner of testifying;
(2) did the witness appear to be telling the truth?
(3) the witness's opportunity to see or hear the things about which testimony was given;
(4) the accuracy of the witness's memory;

■ A presumptively helpful standard in cases relying on eyewitness identification could unnecessarily complicate a case by encouraging a "battle of the experts." Dueling experts could interject differing interpretations of statistics and scientific studies on identification, leaving the jury more confused than aided by the expert opinions. Further, we do not want to force experts upon a court where, as here, the expert's testimony would not have been helpful to a jury. Thus, we reject holding expert testimony on eyewitness reliability to any other standard other than the abuse of discretion standard. Whether the prosecution's case rests solely on eyewitness identification or not, the probative value of expert testimony on eyewitness identification and how much such testimony can actually help the jury in the case before it must be carefully weighed by the court on a case-by-case basis.

## II.

### The Circuit Court's Decision in This Case

■ We will now apply the "appreciable help to the trier of fact" test to the Circuit Court's decision to exclude Dr. Schret-

---

(5) does the witness have a motive not to tell the truth?

(6) does the witness have an interest in the outcome of the case?

(7) was the witness's testimony consistent?

(8) was the witness's testimony supported or contradicted by evidence that you believe? and

(9) whether and the extent to which the witness's testimony in the court differed from the statements made by the witness on any previous occasion.

MPJI–Cr 3:30 addresses a witness's identification of the defendant: You have heard evidence regarding the identification of the defendant as the person who committed the crime. In this connection, you should consider the witness's opportunity to observe the criminal act and the person committing it, including the length of time the witness had to observe the person committing the crime, the witness's state of mind and any other circumstance surrounding the event. You should also consider the witness's certainty or lack of certainty, the accuracy of any prior description, and the witness's credibility or lack of credibility, as well as any other factor surrounding the identification. Indeed, the trial judge in this case delivered both of the instructions above.

len's expert testimony on eyewitness identification, giving deference to the trial court's exercise of discretion, and taking care to determine whether the court adopted a negative view of such testimony in light of *Bloodsworth*. We apply this test in the course of considering Bomar's arguments in favor of admission.

Bomar claims the proffered expert testimony would have been helpful to the jury because it would inform the jury how (1) a "trained observer" does not recall an event more accurately than a lay person; (2) confidence is not necessarily correlated with accuracy; (3) a memory tends to fade over time in a "curvilinear" fashion; (4) stress can adversely affect one's memory; and (5) the manner a photo array is presented to an eyewitness can lead to false identifications.

Bomar argues Dr. Schretlen's testimony would have informed jurors, "contrary to popular belief[,]" that a "trained observer" does not have a better memory than a layperson. In support of this opinion, Bomar also cites statements from a series of articles. *See* Schmechel, et al., 46 JURIMETRICS at 200; Timothy P. O'Toole, et al., *District of Columbia Public Defender Survey: What Do Jurors Understand About Eyewitness Reliability*, THE CHAMPION, April 2005, at 29. But Dr. Schretlen did not rely on any of the articles or studies therein as the basis of his opinion. In fact, the record is devoid of any specific study whose data Dr. Schretlen relied on to form his opinion on this issue.

The CSA regarded Dr. Schretlen's testimony as "vague" and found the motions judge's exclusion of it "understandabl[e]." *Bomas*, 181 Md.App. at 217, 956 A.2d at 223. We agree; the testimony is extremely general, vague, and inconclusive. Further, the witness offered nothing to support his general statements. The Circuit Court was well within the realm of its discretion in excluding this testimony in light of the third prong of Rule 5–702, which calls for a "sufficient factual basis" to support the expert's testimony. *See Buxton v. Buxton*, 363 Md. 634, 651, 770 A.2d 152, 162 (2001) (experts' testimony properly admitted when "both described the basis

for their assumptions and calculations"); *Young v. State,* 388 Md. 99, 119 n. 11, 879 A.2d 44, 56 n. 11 (2005) ("Testimony describing the methods employed in examining the DNA samples and calculating the match probabilities can lay the foundation for the trial court to determine that a sufficient factual basis exists for the DNA expert to testify to the source of the DNA evidence.")

■ Bomar next suggests that the court erred in precluding Dr. Schretlen's testimony on the lack of a correlation between a witness's confidence and accuracy. But during his testimony, Dr. Schretlen described conflicting conclusions drawn by studies in this area. He even described scientific research on the relationship between confidence and accuracy as "mixed" and expanded on this, stating:

> Some studies show that how confident an eye witness is does predict the accuracy of his or her memory in that more confident eyewitnesses tend to be more accurate. Other studies have shown that there isn't a relationship between the two.... Under some circumstances, confidence is a pretty good predictor.

The trial court had discretion to exclude this testimony under Rule 5–702 because it offered nothing of value to the jury. Testimony based on unspecified studies with conflicting conclusions regarding the correlation between confidence and accuracy in identifying persons would offer little to no help to the jury in evaluating Bailey's identification of Bomar.

■ On the effect of time on memory, the motions court was entitled to find that, under these circumstances, Dr. Schretlen's testimony would have been unhelpful to a jury or within the common knowledge of a layperson. The effect of time on memory is something, as the doctor concedes, within the ken of jurors. The "curvilinear" relationship of the "forgetting curve," whereby an individual tends to lose the most information about an event in the first moments post-exposure, which may not be known by jurors, would not have been helpful to the jury here because Bailey and Dower made their identifications six months after the shooting. The date of

their identification places their recollections of the shooting in the part of the memory curve that is intuitive to a layperson.

■ Dr. Schretlen's proffered opinion on the effect of stress on memory also would have been confusing to a jury. Dr. Schretlen's testimony insufficiently related to the facts of the case because the lone study he cited involved individuals who had directly experienced the high stress event, whereas Bailey and Dower witnessed the shooting at a distance. The testimony also shed little light on how to quantify the stress levels of the eyewitnesses who are not the subjects of the stress-inducing event. Indeed, according to Dr. Schretlen, individuals experience stress differently. Dr. Schretlen also conceded that low to moderate levels of stress might actually be beneficial to memory. Other than the prisoners of war study, Dr. Schretlen acknowledged that very few studies of stress during violent events have been performed because such studies would not gain academic approval to proceed. For these reasons, the motions court was warranted in determining that Dr. Schretlen's testimony on the effects of stress would not have been helpful to a jury.[15]

## CONCLUSION

■ As Bomar points out, the Supreme Court over forty years ago stated "[t]he vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification." *United States v. Wade,*

---

**15.** Bomar also argues that Dr. Schretlen's testimony should have been admitted because it would inform the jury about the "relative judgment" phenomenon. This term refers to feedback a putative witness receives from the administrator of a photo array, which causes the witness to misidentify persons in the array (because the witness is likely to select the individual who most resembles the suspect). Citing a single study, Dr. Schretlen opined that where a perpetrator is not present in a photo array, witnesses will select the person who most closely resembles the perpetrator; where the perpetrator is present in the photo array, "the eyewitnesses are most likely to identify the perpetrator because he looks most like himself." We shall not consider this issue. It was neither raised in the CSA, nor included in the petition for certiorari. *See* Md. Rule 8–131(b).

388 U.S. 218, 228, 87 S.Ct. 1926, 1933, 18 L.Ed.2d 1149 (1967). This piece of judicial wisdom has not abated with time, and we are sensitive to the perils of such testimony. With this in mind, we reiterate that trial courts, in considering the admission of expert testimony regarding eyewitness observation and memory, should recognize scientific advances that have led to a greater understanding of the mechanics of memory that may not be intuitive to a layperson.

Our examination of the record in this case assures us, however, that the trial court demonstrated that it was cognizant that an expert might well possess reliable and helpful information to impart to a jury on the subject of eyewitness testimony. There is no indication that the Circuit Court excluded Dr. Schretlen's testimony on account of any bias against expert testimony on the subject of eyewitness observation and memory. Rather, it carefully considered the proffered testimony's foundation, relevance to the facts of the case, and helpfulness to the jury. The Circuit Court was entitled to conclude, as it did, that the topics covered by the proffered testimony were inadmissible for at least one of the following reasons: the testimony (1) lacked adequate citation to studies or data, (2) insufficiently related to the identifications at issue, and/or (3) addressed concepts that were not beyond the ken of laypersons. Because of these deficiencies, the court had ample basis to conclude that the proffered testimony would have been unhelpful to the jury.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; COSTS TO BE PAID BY PETITIONER.**